## Nos. 09-8075 & 08-8061 (consolidated)

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE TENTH CIRCUIT

STATE OF WYOMING,
Plaintiff – Appellee,

and COLORADO MINING ASSOCIATION,
Intervenor-Plaintiff-Appellee

v.

UNITED STATES DEPARTMENT OF AGRICULTURE; UNITED STATES FOREST
SERVICE; TOM VILSACK, SECRETARY, DEPARTMENT OF AGRICULTURE; TOM
TIDWELL, CHIEF FORESTER, UNITED STATES FOREST SERVICE,
Defendants – Appellants,

BIODIVERSITY CONSERVATION ALLIANCE; DEFENDERS OF WILDLIFE; NATIONAL
AUDOBON SOCIETY; NATURAL RESOURCES DEFENSE COUNCIL; PACIFIC RIVERS
COUNCIL; SIERRA CLUB; WILDERNESS SOCIETY; AND WYOMING OUTDOOR
COUNCIL,
Defendants-Intervenors-Appellants

On Appeal from the United States District Court for the District of Wyoming
Clarence A. Brimmer, District Judge (No. 07-cv-00017-CAB)

### BRIEF OF APPELLEE STATE OF WYOMING

Jay Jerde
Deputy Attorney General
James Kaste
Senior Assistant Attorney General
123 Capitol Building
Cheyenne, WY  82002
(307) 777-6946
Attorneys for Appellee State of Wyoming          **ORAL ARGUMENT IS REQUESTED**

# **TABLE OF CONTENTS**

Table of Authorities ..................................................................................................ii

Statement of the Issues Presented for Review ................................................... 1

Statement of the Case ........................................................................................ 2

Statement of Facts .............................................................................................. 3

Summary of Argument ....................................................................................... 13

Standard of Review ............................................................................................ 14

Argument ............................................................................................................ 14

I. The District Court correctly held the Forest Service violated NEPA when it promulgated the Roadless Rule without allowing a meaningful opportunity for public participation and without taking a hard look at the Rule's impacts. ................................. 14

      A. Scoping Process ................................................................... 16
      B. Cooperating Agency Status ................................................. 20
      C. Reasonable Range of Alternatives ..................................... 23
      D. Cumulative Impacts Analysis ............................................ 28
      E. Supplemental EIS ............................................................... 30
      F. Site-Specific Analysis ........................................................ 36
      G. Flawed NEPA Process ....................................................... 37

II. The Roadless Rule was a de facto administrative designation of 58.5 million acres of National Forest Land as "wilderness area," in violation of the NFMA, MUSYA, and Wilderness Act ................................................................................................... 39

      A. NFMA Violations ............................................................... 40
      B. MUSYA Violations ............................................................ 43
      C. Wilderness Act Violations ................................................. 44

III. The District Court properly enjoined the Roadless Rule nationwide upon finding the rule was illegally promulgated .......................................................................... 50

Conclusion .......................................................................................................... 51

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Amax Land Co. v. Quarterman,* 181 F.3d 1356 (D.C. Cir. 1999) ..................................... 49

*Bob Marshall Alliance v. Hodel,* 852 F.2d 1223 (9th Cir. 1988) ..................................... 48

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988) ................................................ 40

*Califano v. Sanders*, 430 U.S. 99 (1977) .......................................................................... 22

*California ex rel. Lockyer v. USDA*, 459 F.Supp.2d 874 (N.D.Cal. 2006) ........................ 2

*California ex rel. Lockyer v. USDA,* 575 F.3d 999 (9th Cir. 2009) ................................ 3, 51

*California v. Block,* 690 F.2d 753 (9th Cir. 1982) .................................... 19, 26, 29, 36, 37

*Catron County Bd. of Comm'rs, N.M. v. U.S. Fish & Wildlife Serv.,*
   75 F.3d 1429 (10th Cir. 1996) ....................................................................................... 39

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 4*67 U.S. 837 (1984) ................. 40

*Citizens for Better Forestry v. USDA*, 632 F.Supp.2d 968 (N.D. Cal. 2009) ................... 51

*Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ........................... 14, 21

*Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.,*
   297 F.3d 1012 (10th Cir. 2002) .................................................................................... 24

*Colo. Envtl. Coal. v. Dombeck,* 185 F.3d 1162 (10th Cir. 1999) ...................................... 15

*Conservation Law Found. of New England v. Gen. Servs. Admin.,*
   707 F.2d 626 (1st Cir. 1983) ......................................................................................... 36

*Custer County Action Ass'n v. Garvey*, 256 F.3d 1024 (10th Cir. 2001) .......................... 28

*Davis v. Mineta,* 302 F.3d 1104 (10th Cir. 2002) ............................................ 27, 30, 37, 51

*Dubois v. USDA*, 102 F.3d 1273 (1st Cir. 1996) ............................................................... 33

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) .................................. 50

*Forest Guardians v. Babbitt*, 174 F.3d 1178 (10th Cir. 1999) ............................................. 50

*Friends of the Bow v. Thompson*, 124 F.3d 1210 (10th Cir. 1997) ...................................... 15

*J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928) ...................................... 39

*Kootenai Tribe of Idaho v. Veneman*, 142 F.Supp.2d 1231 (D. Idaho 2001).................... 39

*Kootenai Tribe of Idaho v. Veneman,* 313 F.3d 1094 (9th Cir. 2002)................................ 39

*Morton v. Mancari*, 417 U.S. 535 (1974) ......................................................................... 49

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,*
145 F.3d 1399 (D.C. Cir. 1998)........................................................................................ 51

*Natural Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288 (D.C. Cir. 1988) ........................ 28

*New Mexico* e*x rel. Richardson v. BLM,* 565 F.3d 683 (10th Cir. 2009) ..................... 31, 32

*Nielander v. Bd. of County Comm'rs of County of Republic, Kan.*
582 F.3d 1155 (10th Cir. 2009) ....................................................................................... 40

*NISH v. Rumsfeld*, 348 F.3d 1263 (10th Cir. 2003)........................................................... 49

*Nw. Coal. for Alternatives to Pesticides v. Lyng*, 844 F.2d 588 (9th Cir. 1988) ............... 17

*Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55 (2004) ............................................. 42

*Olenhouse v. Commodity Credit Corp.*, 42 F. 3d 1560 (10th Cir. 1994)............................ 14

*Park County Res. Council, Inc. v. USDA,* 817 F.2d 609 (10th Cir. 1987) ........................ 14

*Parker v. United States*, 309 F.Supp. 593 (D. Colo. 1970) ............................................... 47

*Pennaco Energy, Inc. v. U.S. Dep't of the Interior*, 377 F.3d 1147 (10th Cir. 2004) ........ 14

*Providence Road Cmty. Ass'n v. EPA*, 683 F.2d 80 (4th Cir. 1982) ................................. 17

*Ragsdale v. Wolverine World Wide, Inc.,* 535 U.S. 81 (2002) ........................................... 40

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989).................... 15, 19, 30

*Sierra Club v. Marsh*, 872 F.2d 497 (1st Cir. 1989)..........................................30

*Sierra Club v. Martin*, 168 F.3d 1 (11th Cir. 1999)..........................................42

*Sierra Club v. Peterson*, 717 F.2d 1409 (D.C. Cir. 1983)..................................36

*Sierra Club-Black Hills Group v. U.S. Forest Serv.*, 259 F.3d 1281 (10th Cir. 2001).......50

*S. Utah Wilderness Alliance v. Norton*, 301 F.3d 1217 (10th Cir. 2002) ..........................31

*Utah v. Babbitt,* 53 F.3d 1145 (10th Cir. 1995)..................................................49

*Univ. of Texas v. Camenisch*, 451 U.S. 390 (1981)..........................................39

*Utahns for Better Transp. v. U.S. Dep't of Transp.,* 305 F.3d 1152 (10th Cir. 2002)........28

*Wilderness Workshop v. BLM*, 531 F.3d 1220 (10th Cir. 2008)........................................46

*Wyoming v. USDA*, 277 F.Supp.2d 1197 (D.Wyo. 2003)......................................2

*Wyoming v. USDA*, 414 F.3d 1207 (10th Cir. 2005) ..........................................2

*Wyoming v. USDA,*
    570 F.Supp.2d 1309 (D.Wyo. 2008) ........................3,16,19,20,23,30,31,36,40,44-46,50

## Federal Statutes

5 U.S.C. §§ 701 through 706 ...........................................................................2

5 U.S.C. §701 ........................................................................................20

5 U.S.C. § 706 ...................................................................................14, 50

16 U.S.C. 475................................................................................................49

16 U.S.C. §§ 528 through 531 ...................................................................13

16 U.S.C. § 528............................................................................................43

16 U.S.C. § 529............................................................................................44

16 U.S.C. § 551............................................................................................49

16 U.S.C. §§ 1131 through 1136 ...................................................................... 2

16 U.S.C. § 1131 .................................................................................... 44, 45

16 U.S.C. § 1132 ........................................................................................ 45

16 U.S.C. § 1133 .................................................................................... 46, 47

16 U.S.C. §§ 1600 through 1614 ...................................................................... 13

16 U.S.C. § 1604 ..................................................................................... 40-42

16 U.S.C. § 1612 ........................................................................................ 41

42 U.S.C. § 4321 through 4370 ........................................................................ 2

42 U.S.C. § 4331 ........................................................................................ 21

42 U.S.C. § 4332 .................................................................................... 36, 37

**Federal Regulations**

40 C.F.R. § 1500.1 ...................................................................................... 17

40 C.F.R. §§ 1501.6 ..................................................................................... 20

40 C.F.R. § 1501.7 ...................................................................................... 16

40 C.F.R. § 1502.9 ...................................................................................... 31

40 C.F.R. § 1502.14 ..................................................................................... 23

40 C.F.R. § 1508.5 ...................................................................................... 20

40 C.F.R. § 1508.7 ...................................................................................... 28

40 C.F.R. § 1508.8 ...................................................................................... 28

40 C.F.R. § 1508.25 ..................................................................................... 28

**Federal Register Notices**

46 Fed. Reg. 18026 (March 23, 1981) ................................................................. 33

66 Fed. Reg. 35918 (July 10, 2001) ........................................................... 42

70 Fed. Reg. 25654 (May 13, 2005) ........................................................... 2

73 Fed. Reg. 61456 (Oct. 16, 2008) ........................................................... 3

**Other Federal Authorities**

U.S. Const. Art. IV, § 3 ........................................................... 39

S.Rep. No. 94-893 *reprinted in* 1976 U.S.C.C.A.N. 6685 ........................................................... 43

H.R. Rep. No. 88-1538 *reprinted in* 1964 U.S.C.C.A.N. 3615 ........................................................... 47

Micheal J. Mortimer, *The Delegation of Law-Making Authority to the United States Forest Service:  Implications in the Struggle for Nat'l Forest Mgmt.*, 54 Admin. L. Rev. 907, 959 (2002) ........................................................... 46

## PRIOR OR RELATED APPEALS

This matter was previously appealed to this Court, but dismissed as moot prior to a decision on the merits.  *Wyoming v. USDA*, 414 F.3d 1207 (10th Cir. 2005) (No. 03-8058).

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

I.      Whether the Forest Service failed to allow meaningful public participation and failed to take a hard look at the Roadless Rule's impacts in violation of NEPA.

II.     Whether the Forest Service violated the National Forest Management Act, the Multiple-Use and Sustained-Yield Act and the Wilderness Act by adopting a rule that disregarded its obligation to individually manage national forests for multiple uses and created a de facto wilderness area.

III.    Whether the APA required the District Court to enjoin the Roadless Rule nationwide upon finding it was illegally promulgated.

## STATEMENT OF THE CASE

This matter arises out of substantive and procedural challenges to the promulgation of the Roadless Area Conservation Rule (Roadless Rule) by the United States Department of Agriculture and the United States Forest Service (collectively "Forest Service"). (Aplt.App. at 394-424). On July 14, 2003, the United States District Court for the District of Wyoming ruled that the Roadless Rule was promulgated in violation of the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 through 4370f, and the Wilderness Act, §§ 16 U.S.C. 1131-1136, and consequently, that the Roadless Rule must be set aside pursuant to the provisions of the Administrative Procedures Act (APA), 5 U.S.C. §§ 701-706. *Wyoming v. USDA*, 277 F.Supp.2d 1197 (D.Wyo. 2003).

The decision of the District Court was appealed to this Court, but the Forest Service promulgated a new rule, known as the State Petitions for Inventoried Roadless Area Management Rule (State Petitions Rule), that superseded the Roadless Rule before a decision on the merits was rendered. *See* 70 Fed. Reg. 25,654 (May 13, 2005). In light of the promulgation of the State Petitions Rule, this Court determined that issues related to the Roadless Rule were moot and vacated the District Court's Judgment and related rulings. *Wyoming v. USDA*, 414 F.3d 1207 (10th Cir. 2005).

After the Forest Service adopted the State Petitions Rule, several states and environmental groups challenged its propriety in the United States District Court for the Northern District Court of California. *See California ex rel. Lockyer v. USDA*, 459 F.Supp.2d 874 (N.D.Cal. 2006). That court found the State Petitions Rule was not properly

promulgated and set it aside.  In addition, because this Court had vacated the Judgment of the Wyoming District Court setting aside the Roadless Rule, the California District Court reinstated the Roadless Rule.  The decision of the California District Court setting aside the State Petitions Rule was appealed to the United States Circuit Court of Appeals for the Ninth Circuit and was affirmed on August 5, 2009.[1]  *See California ex rel. Lockyer v. USDA*, 575 F.3d 999 (9th Cir. 2009).

On January 12, 2007, in light of the California District Court decision, Wyoming renewed its challenges to the Roadless Rule in the Wyoming District Court.  (Aplt.App. at 32).  On August 12, 2008, the District Court found that the Roadless Rule had been promulgated in violation of NEPA and the Wilderness Act and set it aside again.  *Wyoming v. USDA*, 570 F.Supp.2d 1309 (D.Wyo. 2008) (Aplt.App. at 151).  Judgment was entered on June 15, 2009.  (Aplt.App. at 289).

## STATEMENT OF FACTS

### Introduction

On January 12, 2001, the Forest Service issued the Roadless Rule.  The Roadless Rule is a rule of nationwide applicability that "prohibits road construction, road reconstruction, and timber harvesting in inventoried roadless areas" on National Forest System lands.  (Aplt.App. at 395).  When the rule was proposed, then Forest Service Chief Michael

---

[1] A rule governing the management of inventoried roadless areas within the State of Idaho was completed pursuant to the State Petitions Rule prior to the Ninth Circuit's decision.  *See* 73 Fed. Reg. 61456 (Oct. 16, 2008).  Accordingly, while the State of Idaho is unlikely to participate in the current appeal, the well reasoned and forceful arguments contained in its prior amicus curiae brief are relevant to these proceedings and ought to be considered by this Court.  (Aplee.Supp.App. at 385).

Dombeck called it "one of the most significant conservation efforts in United States history."

(Aplee.Supp.App. at 76).  Chief Dombeck commented further, "I am excited about the

profound effect this proposal could have on the National Forests and Grasslands we leave to

our children and grandchildren.  Roads and roadless areas have posed management problems

for the Forest Service for many years."  (Aplee.Supp.App. at 77).

Before the proposed Roadless Rule was announced, Chief Dombeck prepared an

"Information Memorandum" for then Secretary of Agriculture Daniel Glickman.

(Aplee.Supp.App. at 53).  The memorandum provided background information, explained the

Roadless Rule, and outlined the timeline for the rulemaking and the tasks the Forest Service

would need to complete.  *Id.*  Chief Dombeck described those tasks and their complexity:

> Data from RARE II and already-existing forest plans would be analyzed to
> determine the environmental and economic effects of the agency's proposed
> action.  Site specific analysis would be required for those areas proposed for
> protection.
>
> . . . .
>
> The environmental analysis will require collection of information on each
> RARE II and forest plan inventoried roadless area. . . . Some of these areas
> have been partially roaded and resource information may need to be updated.
> Updated, site-specific information is essential to evaluate possible resource
> tradeoffs and consequences of removing these areas from road construction
> and/or commodity production.
>
> . . . .
>
> This analysis will be extremely complex.  A full time team of 6-7 people will
> be assigned to do the primary analysis, with support from others as needed
> throughout the process.  Additionally, coordinators at each forest will need to
> be assigned to provide site-specific information as needed[.]

(Aplee.Supp.App. at 55-56).

4

Despite the proposed rule's significance, its "profound effect" on National Forests and Grasslands, and the fact that the Forest Service had been grappling with this issue for many years, the Forest Service proposed to complete rulemaking for the Roadless Rule in one year. (Aplee.Supp.App. at 55-56). This meant one year to gather and respond to public comment, collect and update site-specific information, prepare draft and final environmental impact statements ("EISs"), complete an "extremely complex" analysis, and adopt a final rule. *Id.* The Forest Service developed detailed timelines, but even with the carefully crafted timelines, members of the rulemaking team were skeptical:

> [P]lease find enclosed a draft copy of CAET's [Content Analysis Enterprise Team's] schedule and strategy for meeting your deadline needs. . . . [A]s soon as I have okay from you all - will be sending it on to Dinah Bear at CEQ who is most anxious to see "in writing" how CAET is going to pull this one off . . . actually so am I[.]

(Aplee.Supp.App. at 59, 93).

The Forest Service expedited the rulemaking to meet a presidential directive not to address forest needs. On October 13, 1999, President Clinton directed the Forest Service to develop "regulations to provide appropriate long-term protection for most or all of these currently inventoried roadless areas[.]" (Aplt.App. at 1524). "[T]he President [] tasked the agency with completing the process of issuing final regulations by Fall 2000[.]" (Aplee.Supp.App. at 75). The Forest Service internal communications to the EIS team reiterated the timeframe for completing the rulemaking with the deadline, "get done during the Clinton Administration (Dec. 2000)." (Aplee.Supp.App. at 81). Chief Dombeck also

stressed the importance of the expedited schedule: "This task is big, it is important, and it is urgent. We cannot afford to waste a single day." (Aplee.Supp.App. at 92).

## Scoping Period

Just six days after the President's directive was issued, the Forest Service began its rulemaking by publishing in the Federal Register a Notice of Intent ("NOI") to prepare an EIS. (Aplt.App. at 338). The NOI announced a proposed rule with two components: a prohibition component, eliminating road construction activities in the "remaining unroaded portions" of inventoried roadless areas ("IRAs"); and a procedural component, adopting criteria and procedures to require consideration of roadless values in both IRAs and other uninventoried lands in the forest planning process. *Id.* The NOI outlined four alternatives to be considered:

· Prohibiting new road construction and reconstruction projects in the remaining unroaded portions of inventoried roadless areas;

· Prohibiting new road construction and reconstruction projects and commercial timber harvest in the remaining unroaded portions of inventoried roadless areas;

· Prohibiting the implementation of all activities, subject to valid existing rights, that do not contribute to maintaining or enhancing the ecological values of roadless areas in remaining unroaded portions of inventoried roadless areas; and

· Making no change in current policy.

(Aplt.App. at 339).

The NOI provided no information or estimate as to the geographic scope of the proposed rulemaking, and no maps to identify the affected areas. It set a deadline for public comment of December 20, 1999. (Aplt.App. at 338-39).

When the Forest Service prepared its rulemaking timeline, it stressed the importance of expediting the scoping period. (Aplee.Supp.App. at 59). The public comment period was to be short and "[t]here would be no provision for public meetings." *Id.* The public comment period was kept short, and initially no public meetings were scheduled. On November 10, 1999, though, the Forest Service announced ten public scoping meetings around the country. (Aplt.App. at 340). On December 3, 1999, the Forest Service published a schedule of more than 170 additional public scoping meetings around the country, all to be held in the two remaining weeks of the public comment period. *Id.*

The Forest Service received numerous requests to extend the public comment period, from states, businesses, individuals, and U.S. senators and representatives, but it declined those requests. (Aplee.Supp.App. at 37). The Forest Service also received requests during the scoping period for maps of the affected areas. *Id.* The Forest Service was not able to provide the requested maps during the scoping period because it did not have accurate maps of the affected areas. (Aplee.Supp.App. at 37, 106, 114, 117, 139). The Forest Service did not provide any maps of the affected areas until between January 18, 2000 and January 31, 2000, over one month after the close of the scoping comment period. (Aplee.Supp.App. at 37, 121).

**Draft EIS and Proposed Rule**

On May 10, 2000, the Forest Service issued its proposed Roadless Rule and supporting Draft EIS. (Aplt.App. at 360). The deadline for commenting on the approximately 500-page, two-volume Draft EIS and proposed rule was July 17, 2000. *Id.* The Forest Service denied the numerous requests for an extension of the comment period from Wyoming and others. (Aplee.Supp.App. at 38).

The Draft EIS identified 54.3 million acres of the 192 million acres in the National Forest System as IRAs. (Aplt.App. at 440). The Draft EIS also disclosed that 2.8 million of the inventoried roadless acres in fact contain roads, and it provided that "[p]ortions of inventoried roadless areas containing classified roads built since the areas were inventoried would not be subject to these prohibitions." (Aplt.App. at 440, 456).

The proposed Roadless Rule published in May 2000 contained the two parts proposed in the NOI: the "prohibition component" and the "procedural component." (Aplt.App. at 362). The prohibition component prohibited road construction and reconstruction within the ***unroaded*** portions of inventoried roadless areas. (Aplt.App. at 364). The procedural component required local forest managers during forest plan revisions to identify unroaded areas other than IRAs that may warrant protection for roadless values. (Aplt.App. at 365).

Although the NOI had generated over 500,000 comments, the alternatives for the prohibition rule outlined in the Draft EIS were nearly identical to the alternatives originally included in the NOI, with Alternative (2) being the preferred alternative:

(1) the "no action" alternative;

(2) a prohibition on road construction and reconstruction within unroaded portions of inventoried roadless areas, but allowing timber harvest where such could occur without road construction;

(3) a prohibition on road construction, reconstruction, and timber harvest except when expressly designed for stewardship purposes, in the unroaded portions of inventoried roadless areas; and

(4) a prohibition on road construction, reconstruction, and all timber harvest within unroaded portions of inventoried roadless areas.

(Aplt.App. at 433-36]

The Forest Service received over 1.1 million comments in response to the Draft EIS and proposed rule, including approximately 1 million postcards, 60,000 original letters, 90,000 electronic mail messages, and several thousand telefaxes.[2]  (Aplt.App. at 556). Wyoming and its agencies, and a number of other states, commented on the narrow range of alternatives analyzed in the Draft EIS and requested the Forest Service to broaden its analysis to include additional alternatives.  (Aplee.Supp.App. at 261-327).  In particular, these comments requested consideration of alternatives more restrictive than the no action alternative, but less restrictive than the complete ban on road construction.  *Id.*  Wyoming and others also expressed concern with the maps provided in the Draft EIS, with respect to both their lack of detail and their accuracy.  *Id.*

The maps accompanying the Draft EIS identified only generally the IRAs within each state.  (Aplt.App. Vol. 10).  In generating the maps, the Forest Service relied on forest plans

---

[2] Very few of the respondents who commented on the Draft EIS actually supported the preferred alternative.  (Aplee.Supp.App. at 336).  When the Content Analysis Enterprise Team considered non-form responses it found sentiment among the public and interest groups divided, while a large majority of government entities preferred the no action

and on its 1979 Roadless Area Review and Evaluation (RARE II). (Aplt.App. at 434). The maps did not identify the unroaded areas subject to the procedural component of the proposed Roadless Rule. *Id.* Nor did the maps identify the exempt 2.8 million "roaded" acres within the IRAs. *Id.*

In addition to lacking detail, the maps provided in the Draft EIS were criticized nternally by Forest Service personnel as inaccurate. (Aplee.Supp.App. at 166, 189, 194, 195, 197, 210, 225, 228, 231). Internal reviews of the proposed Roadless Rule and Draft EIS in July 2000 characterized the maps and roadless data as "extremely inaccurate," "old," and "grossly inaccurate." (Aplee.Supp.App. at 166, 189, 195). With respect to the Medicine Bow National Forest in Wyoming, local Forest Service officials commented:

> Using the Medicine Bow as an example, the coverage is extremely inaccurate.
> . . . This coverage is barely sufficient for map-making purposes and is
> insufficient for use in forest-level analysis[.]

(Aplee.Supp.App. at 166).

In fact, the Forest Service Roadless Team knew of the mapping and data inaccuracies before it issued the Draft EIS, but because of the short time it had to produce the Draft EIS, it decided it would not correct the errors until issuance of the Final EIS. (Aplee.Supp.App. at 107, 116). The Roadless Team began gathering data to address the inaccurate mapping after the public comment period closed on the Draft EIS. (Aplee.Supp.App. at 126, 137).

---

alternative. (Aplee.Supp.App. at 361-363). Many parties on both sides of the debate criticized the Draft EIS for being "vague, subjective, and open to interpretation," and the "overwhelming sentiment" of respondents was that the comment period was "woefully inadequate and should be extended." (Aplee.Supp.App. at 350-351).

In addition to inaccuracies, the analysis in the Draft EIS was biased in favor of a prohibition on road construction.  (Aplee.Supp.App. at 161, 213, 237, 244).  Some Forest Service employees criticized the document as more of a "public <u>relations</u> document than a public <u>disclosure</u> document" and noted that the Draft EIS contained "exaggerated claims of manufactured benefits" and "excessive negative impacts."  (Aplee.Supp.App. at 167, 193 (underline in original)).  Other employees actually discussed that the Draft EIS was not biased enough to convince the public of the need for action, and that the Final EIS would need to make "compelling arguments" to "justify the policy."  (Aplee.Supp.App. at 190, 456).

## Final EIS and Rule

The Forest Service issued its Final EIS on November 13, 2000.  (Aplee.Supp.App. at 258).  While all of the action alternatives continued to ban road construction, the Final EIS departed from the Draft EIS and proposed Roadless Rule in many respects.  First, the Final EIS broadened the scope of the Roadless Rule's prohibition component, applying it to ***all*** IRAs, not just the "unroaded portions" of IRAs.  (Aplt.App. at 536-39).  Second, the Final EIS adopted a more restrictive alternative, choosing prohibition alternative (3) prohibiting road construction, road reconstruction and timber harvest (except for stewardship purposes) in all IRAs.  (Aplt.App. at 584).  Third, between the preparation of the Draft and Final EISs, the Forest Service identified an additional 4.2 million acres of roadless areas that would be subject to the rule.  (Aplt App. at 550).  Last, the Final EIS eliminated the proposed rule's procedural component.  (Aplt.App. at 536).

11

The maps accompanying the Final EIS identify in a general manner the IRAs within each state subject to the Roadless Rule.  (Aplt.App. at 1176-1194).  The maps do not identify existing roads within the roadless areas, nor do they identify the additional 4.2 million acres of "roadless" areas subject to the Roadless Rule.  *Id.*  This vagueness was a product of the Forest Service's deficient information.   In late November and early December, 2000 (approximately two weeks after the Final EIS was issued), the Forest Service Roadless Team still had inadequate data related to roaded acres within the IRAs.  (Aplee.Supp.App. at 140, 141).  It set an internal deadline of January 15, 2001 for obtaining the information–several days after the Record of Decision and release of the Final Roadless Rule.  (Aplee.Supp.App. at 140).

On January 12, 2001, the Forest Service issued the final Roadless Rule.  The final Roadless Rule departed from the preferred alternative in the Final EIS by further restricting stewardship timber harvests to small diameter timber.  (Aplt.App. at 424).  It also added an exception to the timber harvest prohibition to allow timber harvesting "where roadless characteristics have been substantially altered in a portion of an inventoried roadless area due to the construction of a classified road and subsequent timber harvest."  *Id.*  The final Roadless Rule did not define small diameter timber or identify where timber harvesting would be permitted.  (Aplt.App. at 423).

## SUMMARY OF ARGUMENT

The arguments for and against the Roadless Rule are controversial and hotly contested by advocates on both sides of the political debate. The laws which govern the Forest Service's ability to promulgate valid regulations are not. This appeal does not involve either the endorsement or indictment of the policies or values underlying the rule. Instead, this appeal is about the Forest Service's failure to comply with the nation's basic environmental and land use statutes.

The rulemaking process was conducted in plain violation of NEPA. The Forest Service sought to promulgate, in one year, a rule it called "one of the most significant conservation efforts in United States history." The rushed rulemaking process left no opportunity for meaningful public participation or informed agency decisionmaking, and thus subverted both the letter and spirit of NEPA. Moreover, the National Forest Management Act (NFMA), 16 U.S.C. §§ 1600 through 1614, and the Multiple Use and Sustained Yield Act (MUSYA), 16 U.S.C. §§ 528 through 531, require the Forest Service to evaluate forest use on a forest-by-forest basis employing multiple use principles—not with national scope rules that disregard individual forest characteristics. Finally, the Forest Service simply does not have authority to set aside large areas of national forest land indefinitely with blanket restrictions on access and use. Its attempt to do so with the Roadless Rule created a de facto wilderness area designation, a designation only Congress has the power to make. In light of these clear violations of federal law, the District Court properly set aside and enjoined the

13

implementation of the Roadless Rule, and this considered exercise of judgment by the District Court should be affirmed by this Court.

## STANDARD OF REVIEW

The APA governs judicial review of agency action. *Olenhouse v. Commodity Credit Corp.,* 42 F. 3d 1560, 1573 (10th Cir. 1994). The APA requires that a court set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). This level of review requires a reviewing court "to engage in a 'substantial inquiry.' " *Olenhouse,* 42 F.3d at 1574 (*quoting Citizens to Pres. Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415 (1971)). This Court's review is independent of the district court's review. *Pennaco Energy, Inc. v. U.S. Dep't of the Interior,* 377 F.3d 1147, 1156 (10th Cir. 2004).

## ARGUMENT

I.  **The District Court correctly held the Forest Service violated NEPA when it promulgated the Roadless Rule without allowing a meaningful opportunity for public participation and without taking a hard look at the Rule's impacts.**

NEPA "reflects an important public policy of this nation: the avoidance of precipitous federal decision making at the agency level[.]" *Park County Res. Council, Inc. v. USDA,* 817 F.2d 609, 620 (10th Cir. 1987). To promote this objective, NEPA "prescribes the necessary process" by which federal agencies must "take a 'hard look' at the environmental consequences" of proposed courses of agency action. *Pennaco,* 377 F.3d at 1150. The NEPA process requires preparation of an EIS to ensure that an agency takes a "hard look" at the environmental consequences of its proposed actions. *Friends of the Bow v. Thompson,*

14

124 F.3d 1210, 1213 (10th Cir. 1997). The "hard look" standard is a pragmatic one that assesses whether the EIS's "form, content and preparation foster both informed decision-making and informed public participation." *Colo. Envtl. Coal. v. Dombeck,* 185 F.3d 1162, 1172 (10th Cir. 1999).

The Supreme Court has described the important pre-decisional role of the NEPA process, both for the agency and the public:

> It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.
>
> Simply by focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast.

*Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349 (1989).

Unfortunately, the Forest Service ignored the important role of NEPA in promulgating the Roadless Rule. The District Court correctly held that the Forest Service violated NEPA by failing to provide an adequate scoping period; by denying cooperating agency status to affected states; by failing to consider a reasonable range of alternatives; by failing to conduct an adequate cumulative impacts analysis; and by failing to prepare a supplemental EIS. The sum of these numerous violations was the promulgation of a rule without a meaningful opportunity for public input and without a "hard look" at its impacts. The Forest Service did not use the EIS to assist it in framing the Roadless Rule; it used it to help sell the rule upon

which it had already decided. The record clearly shows the die was cast before the NEPA process was initiated.

## A.    <u>Scoping Process</u>

As its first step in preparing an EIS, an agency must determine the scope of issues to be addressed and identify significant related issues. 40 C.F.R. § 1501.7. This scoping process must be "early and open," and the agency must invite the participation of states and other interested parties. 40 C.F.R. §§ 1501.7, 1501.7(a)(1).

The District Court held that the scoping process for the Roadless Rule EIS precluded meaningful participation because the Forest Service provided no accurate data or maps describing the geographic ambit of the proposed rule and refused to extend the public comment period until such information could be provided. *Wyoming,* 570 F.Supp.2d at 1332-34. The Forest Service and the Wyoming Outdoor Council, *et al.* (collectively "WOC") argue this is error because: 1) NEPA's scoping regulations do not specifically require maps or require that the agency grant extensions of the scoping comment period; 2) the NOI stated the Forest Service would be relying on the IRAs identified in the RARE II inventories and forest plan inventories; and 3) maps were displayed during Wyoming scoping meetings. (Forest Service Brief at 41-43; WOC Brief at 37-41). None of these arguments have any merit.

Wyoming agrees that the NEPA scoping regulations do not specifically require maps or extensions of the scoping period upon request. However, they do require that environmental information of "high quality" be made available to public officials and

citizens "before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b). The RARE II and forest plan inventories cited in the NOI, and the maps displayed during the Wyoming scoping meetings, were not information of "high quality." The Forest Service itself acknowledged the information was outdated, with some officials characterizing it as shaky, inaccurate and grossly inaccurate. (Aplee.Supp.App. at 117, 118, 139, 166, 195). The maps displayed during the Wyoming scoping meetings were likewise inaccurate, and even if they had been accurate, those meetings were all held in the last few days of the scoping period, leaving little time for review and comment after the meetings. (Aplt.App. at 340).

The Forest Service and WOC assert that deficiencies in the scoping process should not invalidate the entire EIS. (Forest Service Brief at 42-43; WOC Brief at 40). Of course, the holdings in the cases cited by Appellants are premised on an agency curing any defects in the scoping process with no resulting prejudice to the interested parties. *See Nw. Coal. for Alternatives to Pesticides v. Lyng,* 844 F.2d 588, 596 (9th Cir. 1988) ("Although the BLM's violation of the scoping provisions is regrettable, Northwest was not prejudiced as a result of the violation[.]"); *Providence Road Cmty. Ass'n v. EPA,* 683 F.2d 80, 82 (4th Cir. 1982) ("Even though the appellants . . . were unable to participate until the eleventh hour, their comments were received and considered by the EPA before . . . its final decision[.]"). The premise of these holdings makes them distinguishable from this case. The deficiencies in the scoping process for the Roadless Rule were never cured; they were carried through the Draft EIS and even through the Final EIS.

The Forest Service provided no accurate data during the scoping period and did little

17

to improve the deficiency before adopting a final rule. Before the Draft EIS was completed, the Roadless Team was notified by its regional offices of problems with the mapping and IRA data. (Aplee.Supp.App. at 115). The Forest Service made the decision then that it would not correct the data for the Draft EIS because its deadline was more important than accurate data: "We have to lock down the data to meet the EIS timelines for the draft. We will have another opportunity to update data between the draft and final." (Aplee.Supp.App. at 116). Unfortunately, because the only opportunity for public comment during the NEPA process was on the information in the Draft EIS, updates between the Draft and Final EISs were not helpful. As one Forest Service official observed:

> The "Decision to be made" includes "should road construction, reconstruction, and/or timber harvest be prohibited in the unroaded portions of inventoried roadless areas?" The agency needs to identify and quantify the unroaded portions of inventoried roadless areas. This has not been done in the DEIS and the public decision maker cannot determine the extent of the effects unless the areas affected are identified.

 (Aplee.Supp.App. at 167).

If there had been an opportunity to comment on the Final EIS, it would not have been meaningful because the mapping and IRA data remained inaccurate. The Final EIS was issued in November 2000. Yet, as of December 4, 2000, the Forest Service was still trying to collect updated IRA information:

> [T]his is just FYI on a data request we are making to our Forests to have better information about roaded impacts with the IRA boundaries. Only 6 of our 14 units have what I would consider is a current good IRA inventory. The rest were old ones from the first round of planning, or in the case of three Utah Forests, 80's vintage RARE II maps.

(Aplee.Supp.App. at 140).

18

The Forest Service and WOC argue that the Forest Service did all it had to during the scoping period by first inviting participation of states and others, and then determining the scope of the EIS and significant issues. (Forest Service Brief at 41; WOC Brief at 38). NEPA requires more than going through the motions or "grudging pro forma compliance[.]" *California v. Block,* 690 F.2d 753, 769 (9th Cir. 1982) (citations omitted). NEPA's procedural requirements "are to be strictly interpreted 'to the fullest extent possible' in accord with the policies embodied in the Act." *Id.* NEPA's goal is informed decision making–an "assurance that the agency 'has indeed considered environmental concerns' " and has provided "a springboard for public comment[.]" *Robertson,* 490 U.S. at 349. The Forest Service did not provide a springboard for public comment during the scoping period; it provided no accurate data on coverage of the Roadless Rule, and it refused to extend the scoping period until such data could be provided.

The District Court appropriately rejected the Forest Service's "mere pro forma" compliance with NEPA's scoping procedures. *Wyoming,* 570 F.Supp. 2d at 1333-34. As it observed, "maps accurately depicting the areas covered by the Roadless Rule are the most basic and fundamental information needed to begin the scoping process." *Id.* at 1333. Similarly, Judge Lodge sitting in the District of Idaho observed, "[w]hen the areas contemplated to be roadless are not defined or shown by way of maps or otherwise illustrated, one does not have to be learned in the law to determine the public's participation will hardly be 'meaningful.' " (Aplee.Supp.App. at 379). The District Court thus properly held that the "Forest Service's refusal to extend the scoping period, notwithstanding the

protests of nearly all of the affected states, for the sole reason of meeting a self-imposed deadline was arbitrary and capricious."  *Wyoming*, 570 F.Supp. 2d at 1333-34.

**B.**     **Cooperating Agency Status**

Early in the NEPA process, Wyoming requested cooperating agency status pursuant to NEPA regulations, 40 C.F.R. §§ 1501.6 and 1508.5.  (Aplt.App. at 1530-31).  Although the Forest Service had identified Wyoming as one of the states "most affected" by the Roadless Rule, the Forest Service denied Wyoming's request, along with all other requests. (Aplee.Supp.App. at 65-66).  Moreover, the Forest Service did not even respond to Wyoming's request until after the Draft EIS was issued, and the Forest Service never gave Wyoming a reason for denying the request.[3]  (Aplt.App. at 1525).  Accordingly, the District Court found that the Forest Service arbitrarily and capriciously denied cooperating agency status to Wyoming, and the nine other "most affected" states.  *Wyoming,* 570 F.Supp. 2d at 1334-35.

The Forest Service and WOC argue the District Court erred because decisions to grant or deny cooperating agency status to states are entirely discretionary and not subject to judicial review under the APA.  (Forest Service Brief at 45; WOC Brief at 42).  *See* 5 U.S.C. §701(a)(2) (providing that judicial review is not available where "agency action is committed

---

[3]  The Forest Service referred Wyoming to a letter the Forest Service had sent the Western Governors' Association, offering affected states "collaboration procedures" rather than cooperating agency status.  By collaboration, the Forest Service meant the states could collect and synthesize comments for it.  The "invitation" was not sent directly to Wyoming and was not in any fashion designed to allow meaningful state participation.  (Aplt.App. at 1526-27).

to agency discretion by law."). The Supreme Court has indicated that "[t]his is a very narrow exception[,]" and is applicable only in those rare cases where statutes are drawn so broadly that there is "no law to apply," *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (overruled on other grounds by *Califano v. Sanders*, 430 U.S. 99, 105 (1977)). In this case, however, NEPA provides a clear framework against which to judge whether the Forest Service abused its discretion when it refused Wyoming's request.

NEPA provides that "it is the continuing responsibility of the Federal Government to use all practicable means . . . to improve and coordinate Federal plans, functions, programs, and resources" to effectuate the purposes of the act. 42 U.S.C. § 4331(b). Accordingly, the relevant standards for the Court's consideration are simply whether it is practicable for the Forest Service to grant cooperating agency status to the most affected States, like Wyoming, and would such cooperation result in an improved Federal plan. The answer to both inquiries is clearly "yes." In fact, even the Forest Service observed that "State and local governments could provide more detailed analysis about local impacts," which was information Chief Dombeck and others viewed as "essential." (Aplee.Supp.App. at 156; 56; 98 ("Recognize this is a 'site specific' decision that has implications for each roadless area protected.")). Instead of taking the opportunity offered by Wyoming and other states to incorporate detailed site-specific data into the analysis which would have resulted in a more informed decision, the Forest Service simply denied all requests for cooperating agency status without explanation. The Forest Service clearly abused its discretion and arbitrarily and capriciously denied Wyoming's request to serve as a cooperating agency.

Moreover, the Forest Service and WOC's argument ignores guidance the CEQ has provided on cooperating agency status and the Forest Service's admitted understanding of that guidance. On July 19, 1999, the CEQ issued a memorandum to agency heads encouraging them to "more actively solicit" states and other entities as cooperating agencies. (Aplee.Supp.App. at 153-54). It touted the benefits of granting cooperating agency status, including "disclosure of relevant information early in the analytical process, receipt of technical expertise and staff support, avoidance of duplication with state, tribal and local procedures, and establishment of a mechanism for addressing intergovernmental issues." (Aplee.Supp.App. at 155). The CEQ closed its memorandum: "Considering NEPA's mandate and the authority granted in federal regulation to allow for cooperating agency status for state, tribal and local agencies, cooperator status for appropriate non-federal agencies **_should be routinely solicited_**." _Id._ (emphasis added). The Forest Service was cognizant of the CEQ memorandum during the promulgation of the Roadless Rule and observed:

> [I]t appears that we have an obligation to consider and even routinely solicit cooperating agency status. The agency chose the scale at which to make the decision and should recognize the complexities and burdens (increased cost and time) this imposes. The CEQ memo is quite clear as to our responsibilities to solicit state, tribal and local governments for cooperating agency participation[.]

(Aplee.Supp.App. at 156). Nevertheless, the Forest Service denied all requests for cooperating agency status without explanation.

The District Court properly held that denial of Wyoming's request for cooperating agency status was arbitrary and capricious, because "[t]here is not one good reason in the administrative record before the Court explaining why cooperating agency status was denied

to the ten most affected states, including Wyoming[.]" *Wyoming*, 570 F.Supp.2d at 1335. This is especially true where the CEQ had encouraged such cooperation, the Forest Service recognized it needed site specific information to adequately analyze the Rule's impacts, and Wyoming could provide that information (assuming the Forest Service provided accurate maps). This was another step in the NEPA process where the Forest Service refused to slow down long enough to use one of NEPA's valuable tools to gather and evaluate relevant information.

## C.    <u>Reasonable Range of Alternatives</u>

NEPA regulations define the alternatives section as the "heart" of the EIS. 40 C.F.R. § 1502.14. The alternatives section must "[r]igorously explore and objectively evaluate all reasonable alternatives," 40 C.F.R. § 1502.14(a), "[d]evote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits," 40 C.F.R. § 1502.14(b), and include a discussion of "appropriate mitigation measures[.]" 40 C.F.R. § 1502.14(f). The purpose of this comparative analysis is to "sharply defin[e] the issues and provid[e] a clear basis for choice among [the] options[.]" 40 C.F.R. § 1502.14.

The District Court held the Forest Service failed in its alternatives analysis by defining the purpose of its proposal so narrowly that it precluded consideration of a reasonable range of alternatives. *Wyoming,* 570 F.Supp.2d at 1335-40. The record supports the District Court's conclusion.

In reviewing an alternatives analysis, this Court considers whether the EIS "contained sufficient discussion of the relevant issues and opposing viewpoints to enable the [agency] to take a hard look at the environmental impacts of the proposed [action] and its alternatives." *Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1031 (10th Cir. 2002) (citation omitted).  In making this determination, the Court "look[s] closely at the objectives identified in an EIS's purpose and needs statement." *Id.* at 1030. "Alternatives that 'do not accomplish the purpose of an action are not reasonable' and need not be studied in detail," but an agency may not define its objectives "so narrowly as to preclude a reasonable consideration of alternatives." *Id.* at 1030-31 (citation omitted).

In the Final EIS, the Forest Service stated the purpose of its proposal was to "conserve and protect the increasingly important values and benefits of roadless areas by . . . prohibiting activities that have the greatest likelihood of degrading desirable characteristics of inventoried roadless areas." (Aplt.App. at 563).  It indicated action was needed because road construction, reconstruction, and timber harvest activities "directly threaten the fundamental characteristics" of IRAs.  *Id.*  According to the Forest Service, "[r]egardless of how well informed individual decisions may be at the local level, any new road building in inventoried roadless areas still results in a loss of **roadless characteristics**." (Aplt.App. at 564).

The Final EIS contained four alternatives: three action alternatives and the required no action alternative. (Aplt.App. at 576).  Given the very narrowly defined purpose and need for the Forest Service's action, it is not surprising that the three action alternatives were identical in their ban on road construction in IRAs.  The only variation among the three

24

action alternatives was in their restrictions on timber harvest. Alternative 2 allowed harvest for any purpose resulting in a 73% reduction due to the prohibition on road construction. (Aplt.App. at 810). Alternative 3 allowed only stewardship harvest, resulting in an 85% reduction in harvest. (Aplt.App. at 812). Alternative 4 prohibited all forms of timber harvest. (Aplt.App. at 813).

The Forest Service's alternatives analysis was driven by its prejudged determination that roads are inherently inconsistent with the ecological values it was seeking to preserve and by a presidential directive to protect over 40 million IRA acres by prohibiting road construction. (Aplee.Supp.App. at 76). From the outset, in internal communications and even in its October 19, 1999, NOI, the Forest Service announced its clear intention to disregard any alternative that did not prohibit road construction. It restricted the EIS to an examination of the "effects of eliminating road construction activities" and "alternatives that limit or eliminate certain activities . . . such as road construction." (Aplt.App. at 338, Aplee.Supp.App. at 76).

The range of alternatives considered by the Forest Service was impermissibly narrow because it did not explore any action alternative that did not prohibit road construction. The result was an alternatives analysis with flaws that mirror those the Ninth Circuit found in the Forest Service RARE II EIS:

> The policy at hand demands a trade-off between wilderness use and development. This trade-off, however, cannot be intelligently made without examining whether it can be softened or eliminated by increasing resource extraction and use from already developed areas. . . .

> The RARE II Final EIS fails to make such an inquiry. The effect is profound. All eight of the alternatives seriously considered by the Forest Service assume that at least thirty-seven percent of the RARE II areas should be developed. . . . In the absence of an alternative that looks to already developed areas for future resource extraction and use, the RARE II decisional process ends its inquiry at the beginning. Although the RARE II Final EIS poses the question of whether development should occur at all, it uncritically assumes that a substantial portion of the RARE II areas should be developed and considers only those alternatives with that end result.

*California,* 690 F.2d at 767.

In its RARE II EIS the Forest Service analyzed eight alternatives designating identical levels of wilderness and nonwilderness acreage. Likewise, the Roadless Rule Final EIS analyzed three action alternatives containing identical bans on road construction. As with the RARE II EIS, the decisional process ended its inquiry at the beginning: the Forest Service uncritically assumed that it was necessary to impose a total prohibition on road construction within IRAs to protect roadless characteristics, and considered only those alternatives with that result.

The void in the Final EIS's alternatives analysis left the Forest Service without information from which it could make an informed decision on its ability to achieve its ecological goals through less restrictive means. That information could have been obtained by considering alternatives such as allowing rotation of roadless areas, allowing temporary or seasonal roads, or allowing exemptions for activities such as hazardous fuel reduction treatments, insect and disease treatments, and forest health management. These were the types of less restrictive alternatives that even Forest Service employees recommended, noting

26

that such alternatives would not be inconsistent with maintaining the desired ecological values:

> • We believe the range of alternatives could be improved by the addition of an alternative considered in detail which looks at management (and potential need for roading) of high risk fire and insect areas and areas needing treatment for TES species. . . . The DEIS offers a reason why an alternative like this was not considered in detail . . . , but this doesn't relieve the agency from offering a "reasonable range of alternatives." (Aplee.Supp.App. at 166).

> • The analysis needs to acknowledge that some of the effects of roading can be eliminated through road management, i.e. roads can be closed seasonally. (Aplee.Supp.App. at 166).

> • "Irreversible loss of roadless character" needs to be discussed in more detail. It is unclear why temporary roads would have this effect. (Aplee.Supp.App. at 173).

> • The range of alternatives needs to be broader with an objective evaluation of the true potential effects. There should be an alternative that displays the effects and benefits of . . . treat[ing] some of the land areas to reduce fire risk, areas needing treatment for wildlife benefits, harvests some of the dead and dying trees, allows mining to occur where the economic benefits are high but also protects the high value watersheds and visual areas. That alternative is non-existent which leads readers to believe that a broad range of realistic alternatives were not considered in this draft EIS. (Aplee.Supp.App. at 192).

The Forest Service and WOC's argument that the Forests Service's project purpose made alternatives banning road building the only reasonable alternatives serves only to highlight the unnecessarily narrow project purpose. The Forest Service and WOC are correct that an agency's purpose generally is entitled to deference, but this Court has also held that it will not allow "an agency to slip past the structures of NEPA" by contriving a purpose "so slender as to define competing reasonable alternatives out of consideration." *Davis v. Mineta,* 302 F.3d 1104, 1119 (10th Cir. 2002) (citation omitted). That is just what the Forest

Service did when it defined the Roadless Rule purpose. The ecological values the Forest Service professed to be protecting were healthier landscapes; a safe, healthy, and productive environment; provision of clean, fresh water; habitat for fish and wildlife species; and securing favorable conditions of water flows. (Aplt.App. at 563-67). Numerous alternative actions may be able to achieve these values, but the alternatives become scarce when this broad range of goals is reduced to a singular objective: eliminate road construction. This narrow objective did not result from an informed analysis. It started out as the goal and was effectively the sole alternative analyzed.

**D.    Cumulative Impacts Analysis**

NEPA requires that an EIS include a cumulative impacts analysis of an agency's proposed action. 40 C.F.R. § 1508.25(a)(2); *Utahns for Better Transp. v. U.S. Dep't of Transp.,* 305 F.3d 1152, 1172 (10th Cir. 2002); *Custer County Action Ass'n v. Garvey,* 256 F.3d 1024, 1035 (10th Cir. 2001). A cumulative impact is one that "results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions[.]" 40 C.F.R. § 1508.7. A cumulative impacts analysis must consider the cumulative ecological, aesthetic, historical, cultural, economic, social and health effects of proposed actions. 40 C.F.R. § 1508.8(b). It must "inform Congress, other agencies, and the general public about the environmental consequences of a certain action in order to spur all interested parties to rethink the wisdom of the action." *Natural Res. Def. Council, Inc. v. Hodel,* 865 F.2d 288, 296 (D.C. Cir. 1988). A cumulative impacts analysis is not sufficient if it "makes only conclusory remarks, statements that do not equip a

decisionmaker to make an informed decision about alternative courses of action[.]" *Id.* at 298.

The Forest Service and WOC do not dispute that a cumulative impacts analysis was required, nor do they dispute that the sum total of the Forest Service's cumulative effects analysis for its comprehensive forest management package was its observation that there would likely be more roadless areas and a decrease in road construction. The Forest Service and WOC instead contend that this analysis was adequate because the forest management initiatives, other than the Roadless Rule, were planning provisions and until local forest officials actually use the new planning criteria, the Forest Service could only speculate about cumulative impacts. (Forest Service Brief at 56; WOC Brief at 29-30). (Forest Service Brief 55; WOC Brief at 31-32). Alternatively, they assert that the deficiencies in the cumulative effects analysis are harmless error because the Forest Service, after the change in administration, abandoned the Planning Regulations and Transportation Policy. These excuses for failing to conduct an adequate analysis are not sufficient to dismiss the Forest Service's NEPA violation.

The Forest Service proposed the Roadless Rule, the Planning Regulations, the Transportation Policy and the Road Management Rule as "separate but consistent rulemaking proposals [that] [t]ogether . . . provide a comprehensive strategy for accomplishing long-term sustainability of our forests and grasslands." (Aplee.Supp.App. at 250). Having chosen the scope of its undertaking, the Forest Service may not rely on "forecasting difficulties" to excuse its inadequate analysis. *California,* 690 F.2d at 765. Furthermore, the Forest Service

29

itself recognized the need for and planned to "overlay the social/economic implications, and identify the incremental contribution of each policy." (Aplee.Supp.App. at 99). Nonetheless, it was not done-not because of forecasting difficulties-but because there was not time.

The Forest Service and WOC's harmless error argument ignores the fundamental purpose of NEPA, to provide information to the agency and the public *before* a decision is made. *See Robertson,* 490 U.S. at 349. NEPA imposes procedural requirements "as a means of safeguarding against environmental harms[.]" *Davis,* 302 F.3d at 1114. The "harm NEPA seeks to prevent is complete when [an] agency makes [a] decision without considering information NEPA seeks to place before [the] decision-maker and public." *Id.* (*citing Sierra Club v. Marsh,* 872 F.2d 497, 500 (1st Cir. 1989)). The harm was complete when the Forest Service adopted its comprehensive forest management package without completing a thorough cumulative impacts analysis, and a harmless error analysis is simply unavailing.

The Forest Service's cumulative impacts analysis amounted to little more than its observation that the rules' combined effect would be the creation of additional acres of unroaded areas. As the District Court observed, "[o]ne need not be an expert in silviculture to draw that general, predictable, and unhelpful conclusion." *Wyoming,* 570 F.Supp.2d at 1342. The Forest Service's analysis did not provide needed information to the public or focus the agency's attention on the environmental consequences of its proposal, as required by NEPA, and the District Court properly concluded this resulted in a flawed EIS.

E.    **Supplemental EIS**

The District Court further found that the Forest Service violated NEPA when it failed

to prepare a supplemental EIS. *Wyoming,* 570 F.Supp.2d at 1344-1345. "An agency must prepare a supplemental assessment if '[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns.' " *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 705 (10th Cir. 2009) (*quoting* 40 C.F.R. § 1502.9(c)(1)(i)). The Tenth Circuit uses a two-prong test in evaluating an agency's decision to develop a supplemental EIS: first, a determination whether the agency took a hard look at the new information, and second, whether the decision not to supplement was arbitrary and capricious. *S. Utah Wilderness Alliance v. Norton,* 301 F.3d 1217, 1238 (10th Cir. 2002) (reversed on other grounds).

The District Court properly concluded that the changes between the Draft EIS and the Final EIS were a continuation of the Forest Service's rush to promulgate the Roadless Rule without taking a hard look at its impacts and without allowing the public to be informed of the impacts. The District Court found the Forest Service made four substantial changes between the Draft and Final EISs when it: 1) broadened the Rule's scope to include roaded areas; 2) identified 4.2 million additional acres of roadless areas that would be subject to the Rule; 3) eliminated the Rule's procedural component; and 4) limited the timber harvesting stewardship exception. *Wyoming,* 570 F.Supp.2d at 1344-1345.

The Forest Service decided to issue the Draft EIS without complete and accurate mapping of affected areas on the assumption it would make any necessary changes between drafts without any consideration of the impacts of that change. (Aplee.Supp.App. at 115-116). Likewise, fundamental changes to the proposed Roadless Rule, such as broadening its

coverage from only unroaded acreage to all acreage within IRAs and removing the procedural component of the rule were explained away in a footnote and a couple of sentences in the Final EIS.  (Aplt.App. at 574-76).  The record contains no indication the Forest Service carefully considered whether to issue a supplemental EIS to allow an opportunity for public comment on the changes to the proposed rule, preferred alternative, and updated mapping.  The clear reason the Forest Service proceeded as it did was its need to meet an arbitrary, self-imposed deadline, and this makes the decision not to prepare a supplemental EIS arbitrary and capricious.

The Forest Service and WOC argue that the Forest Service's failure to prepare a supplemental EIS when it broadened the scope of the Roadless Rule to include roaded areas was not error because it only "slightly" expanded the Roadless Rule's geographic scope.[4] (Forest Service Brief at 58; WOC Brief at 33-34).  Of course, "NEPA does not permit an agency to remain oblivious to differing environmental impacts, or hide these from the public, simply because it understands the general type of impact likely to occur."  *New Mexico ex rel. Richardson*, 565 F.3d at 707.  Here, the Forest Service superficially opined that the effects of the changes between the Draft EIS and the Final EIS would be that there would be more roadless areas, without, for example, considering the environmental and other effects resulting from removing lands with roads on them from otherwise consistent management

---

[4] The Forest Service characterizes the inclusion of an additional 4.2 million acres as mere "map adjustments."  (Forest Service Brief at 16, 19).  To put this number in perspective, consider that Yellowstone National Park consists of 2.2 million acres.  Certainly, if the Forest Service had proposed to develop an additional area almost twice the size of Yellowstone National Park, no party to this litigation would suggest that the development could proceed without a supplemental EIS.

prescriptions adopted in individual forest plans. (Aplt.App. at 576). This was a substantive change in approach to the treatment of roaded roadless areas, which was not contemplated or considered in the Draft EIS, and certainly did not receive a hard look by either the agency or the public.

The Forest Service and WOC further argue that changes between Draft and Final EISs based on public comment are precisely what NEPA contemplates. (Forest Service Brief at 58; WOC Brief at 56). Wyoming agrees that an agency should be receptive to public comment and make responsive changes to its proposed action where appropriate, however, that does not diminish the agency's obligation to prepare a supplemental EIS. In fact, the CEQ contemplates there may be times when an agency adds and selects a new alternative based on public comment, but it has advised that an alternative not disseminated in a draft EIS may be adopted in a final EIS, without further public comment, only if it is "qualitatively within the spectrum of alternatives that were discussed" in the draft EIS; otherwise a supplemental EIS is required. *See* Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,035-36 (March 23, 1981); *see also Dubois v. USDA,* 102 F.3d 1273, 1292 (1st Cir. 1996).

Broadening the Rule's scope from only unroaded portions of IRAs to both roaded and unroaded acreage within IRAs was not within the spectrum of any alternative the Draft EIS discussed. The Forest Service attempted to gloss over this by pointing out that its impacts analysis in the Draft EIS did not distinguish between roaded and unroaded acreage in the IRAs. (Aplt.App. at 576). That was certainly a deficiency in the Draft EIS, but it does not

33

change the fact that the alternatives in the Draft EIS did not include broadening the Rule's

scope. A proposal prohibiting road construction and timber harvesting on all acreage within

IRAs was never on the table, and consequently the public never had an opportunity to

evaluate and comment on such a proposal.

The Forest Service and WOC's argument that the broadened scope of the Roadless

Rule was not a substantial change is contrary to both its own position regarding the need for

roadless area protection and the Forest Service's internal assessment of the impact.  The

Forest Service and WOC contend that only 2.8 million acres or 4.8% of inventoried roadless

areas are roaded and therefore the expanded scope of the Rule is slight.  (Forest Service Brief

at 58-59; WOC Brief at 34).   Yet, it was the development of these 2.8 million acres of

roadless areas over a twenty-year period that created the need for the Roadless Rule in the

first place.  (WOC Brief at 4).  Furthermore, the Forest Service itself had concerns about the

impact of this change to the Roadless Rule and its lack of information on that impact.  One

internal e-mail, dated December 1, 2000, after issuance of the Final EIS, states:

> [T]his is just FYI on a data request we are making to our Forests to have better
> information about roaded impacts with the IRA boundaries.  Only 6 of our 14
> units have what I would consider is a current good IRA inventory.  The rest
> were old ones from the first round of planning, or in the case of three Utah
> Forests, 80's vintage RARE II maps.  ***We didn't think this would be a problem
> earlier since the prohibitions did not apply to "roaded" portions of IRA's,
> but now that it does we think the impact might be big, so we want to quantify
> it.***  So we are doing this to better understand our peculiar impacts for when the
> public starts asking questions.  (Emphasis added.)

(Aplee.Supp.App. at 140).

A November 30, 2000 memorandum to Forest Supervisors confirms that the Forest Service did not know the impacts of its change to the Roadless Rule when it issued the Final EIS:

> The Roadless Area Conservation Initiative Final EIS has now been released. A Record of Decision is expected December 18, 2000, or shortly thereafter. The preferred alternative places prohibitions on road construction and allows for only stewardship timber sales within the boundaries of the inventoried roadless coverages submitted to the WO. This is a change from the draft EIS where "roaded" portions of IRA's would be excluded from the roadless rule.
>
> During our first round of data collection most Forests said they had less than one percent of the area of their IRA's affected by classified roads. This is misleading because the acreage base of a road is small relative to the total area of the IRA. Accordingly we need a better understanding of the impacts of past projects within IRA's. We anticipate being asked to quantify how many miles of classified roads and acres of past activity exist within the boundaries of our IRA's. This exercise will ensure that all Forests calculate the information comparably.

(Aplee.Supp.App. at 141).

The Forest Service's decision making on the Roadless Rule, and the public's ability to meaningfully participate in that decision making, clearly would have benefitted from the preparation of a supplemental EIS. By not preparing a supplemental EIS, the Forest Service did just what NEPA prohibits–it made its decision without having the necessary environmental information available to it and the public. The District Court thus properly held that the Forest Service's decision not to prepare a supplemental EIS was arbitrary and capricious.

**F.     Site-Specific Analysis**

NEPA requires "a detailed statement by the responsible official" on the "environmental impacts" of the proposed action and the "adverse environmental effects which cannot be avoided[.]" 42 U.S.C. § 4332(C). The District Court recognized that at least three different Circuits have concluded that in order to fulfill this statutory mandate, federal agencies are required to conduct a site-specific analysis of the environmental consequences of the proposed action. *Wyoming*, 570 F.Supp.2d at 1340 (*citing Conservation Law Found. of New England v. Gen. Servs. Admin.*, 707 F.2d 626, 630-31 (1st Cir. 1983); *Sierra Club v. Peterson*, 717 F.2d 1409, 1414-15 (D.C. Cir. 1983); *California,* 690 F.2d at 763-64). The District Court declined to require a site-specific analysis in this case, however, because this Court had not yet had an opportunity to give its view on the issue. *Wyoming*, 570 F.Supp.2d at 1340-41. The opportunity now exists in this case for this Court to consider the issue, and this Court should hold, as the other Circuits have, that NEPA requires federal agencies to conduct reasonably thorough site-specific analysis of the consequences of their proposed actions.

In this case, there is no dispute that the Forest Service made no attempt to provide any site-specific analysis of the environmental impacts of the Roadless Rule. Instead the Final EIS assumes that all inventoried roadless areas have essentially the same ecological and social attributes and values. As noted by the Wyoming State Geological Survey, "[t]o lump natural resource issues in Wyoming with the same issues in Arizona or Alabama necessarily results in a diluted and superficial analysis, which by its very nature is less accurate and

36

detailed." (Aplt.App. at 1439). Even a brief review of the Final EIS reveals that the Wyoming State Geological Survey's assessment was correct. The Final EIS is woefully superficial and contains none of the relevant details that typically inform decisions that "significantly affect[] the quality of the human environment[.]" 42 U.S.C. § 4332(C).

In defense of its cursory analysis, the Forest Service contends that it does not have to conduct a site-specific analysis, because the Roadless Rule is nationwide in scope. (Aplt.App. 1257). Of course, "NEPA contains no exemptions for projects of national scope." *California*, 690 F.2d at 765. As in *California*, where the Forest Service decides to allocate millions of acres to a particular management prescription, "the Forest Service may not rely upon forecasting difficulties or the task's magnitude to excuse the absence of a reasonably thorough site-specific analysis of the decision's environmental consequences." *Id.* Absent an accurate and detailed analysis of the real environmental consequences of a proposed action on the specific sites where it will be implemented, it is impossible for an agency to take the hard look required by NEPA.

## G.    **Flawed NEPA Process**

The numerous specific NEPA violations illustrate the greater problem underlying the Roadless Rule NEPA process. It was never intended to inform the agency's decision or involve the public in the decision making process. The Roadless Rule was a foregone conclusion–a decision made long before the public was brought into the process and without any of the information revealed through the NEPA process. *Compare Davis*, 302 F.3d at 1112-13 (Where agency prejudged NEPA issues, this Court found it owed diminished

deference to agency's decision). The decision was made in spite of considerable criticism from career Forest Service employees, and when employees voiced questions about the rule, they were threatened with reprisal. (Aplee.Supp.App. at 159-244, 247).

The Forest Service overcame insurmountable odds to adopt the Roadless Rule on the expedited schedule it set for itself. The undertaking was "big," and the required analysis "extremely complex." (Aplee.Supp.App. at 92, 56). Additionally, many of the assumptions "critical" to completion of the rulemaking within one year did not come to pass. (Aplee.Supp.App. at 59-63). The Forest Service underestimated the public interest in the rule, the number of comments it would need to analyze, the number of public meetings it would need to hold and the length of its comment periods. (Aplt.App. at 556). Nonetheless, it completed its rulemaking in less than a year, an impressive feat, given that revisions to one individual forest plan can take over five years to complete. (Aplee.Supp.App. at 260).

The CEQ wondered early in the NEPA process how the Forest Service was going to "pull this one off." (Aplee.Supp.App. at 93). It pulled it off by not taking a hard look at the Rule's impacts. The one-year timeframe made it impossible for the Forest Service to obtain updated and accurate data, without which there could be no opportunity for meaningful public participation or for the agency to make an informed decision. The result was a flawed EIS–one that Forest Service employees described as "appear[ing] biased" and as

"oversell[ing] the positive effects of the preferred alternative." [5]  (Aplee.Supp.App. at 167-68).

II.     **The Roadless Rule was a de facto administrative designation of 58.5 million acres of National Forest Land as "wilderness area," in violation of the NFMA, MUSYA and Wilderness Act.**

The Property Clause in the United States Constitution provides Congress with the power to enact all necessary rules and regulations respecting the federal government's property.  U.S. CONST. Art. IV, § 3.  Congress may delegate its power to agencies, but in doing so, it must provide "intelligible principle[s] to which the person or body authorized to [act] is directed to conform[.]"  *J.W. Hampton, Jr., & Co. v. United States,* 276 U.S. 394, 409 (1928).  Through its passage of the NFMA and the MUSYA, Congress delegated power to the Forest Service to manage national forests, but that delegation was subject to the constraints in those acts.  Through its passage of the Wilderness Act, Congress retained for itself sole authority to designate wilderness areas.

---

[5] WOC points out that the Ninth Circuit reached the opposite conclusion in *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094 (9th Cir. 2002).  Of course, that decision was based on a challenge to the preliminary injunction entered by Judge Lodge sitting in the District of Idaho in *Kootenai Tribe of Idaho v. Veneman*, 142 F.Supp.2d 1231 (D. Idaho 2001), and therefore, the decision has no persuasive value.  Decisions on preliminary injunctions are made without the benefit of the complete record, using less formal procedures than a trial on the merits, and considered under the lenient burden of proving a likelihood of success on the merits.  The U.S. Supreme Court has explained that such decisions are not even binding on the district court at trial.  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  Moreover, in order for the majority to reverse Judge Lodge's decision, the Ninth Circuit had to decide that the Roadless Rule benefited the environment, and therefore, that it should be subjected to a less stringent review under NEPA.  *Kootenai Tribe*, 313 F.3d at 1120.  This Circuit has resoundingly rejected such subjective application of NEPA requirements.  *Catron County Bd. of Comm'rs, N.M.  v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1437 (10th Cir. 1996).  Finally, the decision of the majority is simply wrong, as Judge Klienfeld describes so thoroughly in his dissent.  *See Kootenai Tribe,* 313 F.3d at 1126-31.  Accordingly, the Ninth Circuit's limited review is not entitled to any deference by this Court.

An agency may not exercise its authority in a manner that is not consistent with "the administrative structure that Congress enacted into law." *Ragsdale v. Wolverine World Wide, Inc.,* 535 U.S. 81, 91 (2002).  Agency power to promulgate regulations is limited to the authority delegated by Congress, *Bowen v. Georgetown University Hospital.,* 488 U.S. 204, 208 (1988), and no deference is due an agency's statutory interpretation if that interpretation contradicts a statute's plain language. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984). The Forest Service promulgated the Roadless Rule in violation of the forest planning and multiple use principles contained in the NFMA and MUSYA.[6]  The Forest Service also created de facto wilderness areas, infringing on Congress' sole authority to make such designations, and the District Court properly set the rule aside as promulgated in excess of the Forest Service's statutory jurisdiction. *Wyoming,* 570 F.Supp.2d at 1350.

## A.     NFMA Violations

NFMA requires the Secretary of Agriculture to "develop, maintain, and, as appropriate, revise land and resources management plans for units of the National Forest System, coordinated with the land and resource management planning process of State and local governments and other Federal agencies."  16 U.S.C. § 1604.  NFMA outlines the process for adopting forest plans and what those plans must contain.

Forest plans, and amendments to those plans, must be prepared using procedures that

---

[6] Although the District Court did not rule on Wyoming's NFMA and MUSYA claims, this Court may "affirm on any grounds that are sufficiently supported by the record to allow for a conclusion as a matter of law." *Nielander v. Bd. of County Comm'rs of County of Republic, Kan*. 582 F.3d 1155, 1166 (10th Cir. 2009).

allow local public input. 16 U.S.C. § 1604(d), (f)(4)-(5); 16 U.S.C. § 1612(a). Once adopted for an individual national forest, a forest plan is the controlling document for management of that forest, and all "[r]esource plans and permits, contracts, and other instruments for the use and occupancy" of the forest must be consistent with that plan. 16 U.S.C. § 1604(i). An inconsistent use requires formal amendment of a forest plan using procedures that again allow local public input. 16 U.S.C. § 1604(d), (f)(4). During the preparation of an initial forest plan, a revision of the plan, or a "significant change" in the plan, the Forest Service must allow at least three months for public comment. 16 U.S.C. § 1604(d), f(4)-(5).

The Roadless Rule's one size fits all approach to forest management, and the manner in which the Forest Service implemented the rule, is at odds with NFMA. This is evident from numerous NFMA violations. For example:

Integrated Plan Documents: NFMA requires that a forest plan "form one integrated plan" containing all of the required multiple use and sustained yield management direction, including "maps and other descriptive documents," so that all land use direction for a particular national forest is available to the public in one document or set of documents. 16 U.S.C. § 1604(f)(1)-(2). The Forest Service did not amend any forest plans when it promulgated the Roadless Rule, and those plans consequently contain inaccurate and incomplete information in violation of NFMA. (Aplt.App. 424).

Timber Production: NFMA requires that lands suitable for timber production be designated while "developing land management plans." 16 U.S.C. § 1604(e) and (k). The Roadless Rule redesignates as unsuitable for commercial timber production 9 million acres

41

that individual forest plans had found suitable for timber production.  66 Fed. Reg. 35918, 35919 (July 10, 2001).  Without amendment or revision of the forest plan, this redesignation violates NFMA.

Comment Periods: NFMA recognizes the value of local public input and requires a three month comment period for forest plan revisions or significant amendments. 16 U.S.C. § 1604(d).  The Forest Service allowed only 69 days for comment on the Draft EIS.

The individualized forest planning required by NFMA is clearly inconsistent with the broad national-scope rulemaking the Forest Service engaged in for the Roadless Rule.  The Forest Service cannot simply "ignore the requirements of" a forest plan.  *Sierra Club v. Martin,* 168 F.3d 1, 4 (11th Cir. 1999); *see also Norton v. S. Utah Wilderness Alliance,* 542 U.S. 55, 69 (2004) (FLPMA "directive that BLM manage 'in accordance with' land use plans, and the regulatory requirement that authorizations and actions 'conform to' those plans, prevent BLM from taking actions inconsistent with the provisions of a land use plan.").  Yet that was precisely the result of the Forest Service's promulgation of the Roadless Rule.

For nearly 30 years, the Forest Service has used forest plans to guide the management of and multiple uses on national forest lands, including the 58.5 million acres of inventoried roadless areas.  66 Fed. Reg. 35918, 35919 (July 10, 2001).  Through that planning, the Forest Service has assigned 24.2 million acres of roadless areas to "roadless or non-development" management prescriptions and 34.3 million acres to management prescriptions that allow road construction.  *Id.*  The Roadless Rule changes the management on those 34.3

million acres, by generally barring roads and timber harvest where the forest plans had allowed them. This the Forest Service did in disregard of individual forest plans and without an amendment to a single forest plan. (Aplt.App. at 423). This was a clear violation of NFMA's mandate that all forest uses and resource plans for an individual forest conform to the relevant forest plan.

The Roadless Rule's application of identical land use restrictions to all IRAs is contrary to the forest management approach Congress intended when it enacted NFMA. It was Congress' intent that there is "not to be a national land management prescription" in NFMA, or Forest Service rules, due to the widely varying biological and socio-economic conditions across national forests. S.Rep. No. 94-893, at 26 and 35, *reprinted in* 1976 U.S.C.C.A.N. 6685, 6694. NFMA outlines the required process for preparing forest plans and prescribes their contents. NFMA provides a clear congressional mandate that management decisions related to units of the National Forest System are to be made through individual forest plans. The Roadless Rule violates this mandate.

## B.    MUSYA Violations

MUSYA, enacted in 1960, preceded passage of both the Wilderness Act (1964) and NFMA (1976). 16 U.S.C. § 528. It declares that national forests are to be "administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes," with nothing in its provisions to be "construed so as to affect the use or administration of the mineral resources of national forest lands[.]" *Id.*

MUSYA requires the Secretary of Agriculture to "develop and administer the renewable surface resources of the national forests for multiple use and sustained yield of the several products and services obtained therefrom." 16 U.S.C. § 529. It further requires that the Forest Service, in its administration of national forests, give "due consideration" to "the relative values of the various resources in particular areas." *Id.* And, it provides that the establishment and maintenance of areas of wilderness are consistent with its purposes. *Id.*

Although maintenance of wilderness characteristics is consistent with MUSYA purposes, the Roadless Rule is not. The Roadless Rule applies to over 30% of national forest lands and directs identical treatment of those lands. (Aplt.App. at 540). This one size fits all approach to management plainly violates MUSYA requirements. It gives no consideration to "various resources" in "particular areas"– a flaw exacerbated by the Forest Service's failure to take a site specific and genuinely hard look at the impacts of the Roadless Rule during the NEPA process. It also precludes administration of renewable resources for multiple use. As the District Court decision recognizes, multiple use cannot be seriously contemplated when access to forests is effectively cut off by the roads prohibition. *See Wyoming,* 570 F.Supp.2d at 1350.

## C.    <u>Wilderness Act Violations</u>

The Wilderness Act was enacted to "secure for the American people of present and future generations the benefits of an enduring resource of wilderness." 16 U.S.C. § 1131(a). To achieve its goal, the Wilderness Act immediately designated certain areas as wilderness and provided the procedure for future designation of "wilderness areas." 16 U.S.C. §

1132(a)-(b).  It further provided, "[N]o Federal lands shall be designated as 'wilderness areas' except as provided for in this chapter or by a subsequent Act."  16 U.S.C. § 1131(a). The District Court found that the Forest Service, in promulgating the Roadless Rule, created a de facto wilderness area infringing on Congress' sole authority to designate wilderness areas.  *Wyoming,* 570 F.Supp. 2d at 1350.  The court reached this conclusion based on the similarities in the definitions and characteristics of roadless areas and wilderness areas, and the similarities in the restrictions on uses within each type of area.  *Id.*  A comparison of IRAs under Roadless Rule restrictions and wilderness areas shows the solid basis for the District Court's decision.

"Wilderness area" is a specifically defined term of art in the Wilderness Act.  The Act defines a wilderness area as "an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain;" or "an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions[.]"  16 U.S.C. § 1131(c).  The Wilderness Act outlines these additional characteristics of a wilderness area:

> (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land . . . ; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.

*Id.*  In comparison, the Forest Service defines an IRA almost identically as "[u]ndeveloped areas typically exceeding 5,000 acres that met the minimum criteria for wilderness

45

consideration under the Wilderness Act and that were inventoried during the Forest Service's

Roadless Area Review and Evaluation (RARE II) process[.]" (Aplt.App. at 1115).

Roadless Rule restrictions on IRAs are also notably similar to those imposed on

congressionally designated wilderness areas. The Wilderness Act prohibits commercial

enterprise, permanent and temporary roads, aircraft and other forms of mechanical

transportation, and structures or installations within wilderness areas. 16 U.S.C. § 1133(c).

The Roadless Rule prohibits all road construction and reconstruction in IRAs and bans all

commercial timber harvest with limited exceptions. (Aplt.App. 423). Of course, roads have

been described as "'the coarse filter in identifying and defining wilderness[,]'" because their

absence practically limits commercial enterprise, aircraft, other forms of mechanical

transportation, and structures or installations.[7] *Wyoming*, 570 F.Supp.2d at 1347 (*quoting*

Michael J. Mortimer, *The Delegation of Law-Making Authority to the United States Forest

Service: Implications in the Struggle for Nat'l Forest Mgmt.*, 54 Admin. L. Rev. 907, 959

(2002)).

Where the wilderness area and Roadless Rule restrictions deviate from each other is in

their exceptions. Here, the Roadless Rule is more restrictive. For example, the Wilderness

Act authorizes the Forest Service to take such measures "as may be necessary in the control

---

[7] The Forest Service and WOC both cite the Court to *Wilderness Workshop v. BLM*, 531 F.3d 1220 (10th Cir. 2008), as evidence that roadless areas are governed by less restrictive rules than wilderness areas. In that case, the Forest Service permitted the construction of an underground pipeline over a short span of roadless area, because the pipeline could be installed and maintained without constructing a road. The circumstances presented in that case are unique and unlikely to happen with any regularity, since most commercial enterprises will require the construction of at least a temporary road.

of fire, insects, and diseases[.]"  16 U.S.C. § 1133(d)(1).  The Roadless Rule's exception is

more limited and allows road construction only to address an "imminent threat of flood, fire,

or other catastrophic event that, without intervention, would cause the loss of life or

property."  (Aplt.App. at 423).

All of the Forest Service and WOC's attempts to distinguish roadless areas from

wilderness areas are based on the notion that the Roadless Rule does not directly prohibit

most commercial and recreational activities in roadless areas.  They steadfastly ignore,

however, the plain fact that these activities are just as effectively prohibited indirectly by the

Roadless Rule.  This District Court rightly chose not to ignore the real effects of the Roadless

Rule.  This Court should similarly look beyond the Forest Service's strawman and find that

the Roadless Rule is an improper attempt to designate de facto wilderness areas by

administrative fiat.

In addition, one of the "major purposes" of the Wilderness Act was to place "ultimate

responsibility for wilderness classification in Congress," and to create a "statutory framework

for the preservation of wilderness that would permit long-range planning and ***assure that no***

***future administrator could arbitrarily or capriciously . . . make wholesale designations of***

***additional areas in which use would be limited.***"  *Parker v. United States,* 309 F.Supp. 593,

597 (D. Colo. 1970), *aff'd*, 448 F.2d 793 (10th Cir. 1971) (emphasis added) (quoting H.R.

Rep. No. 88-1538 *reprinted in* 1964 U.S.C.C.A.N. 3615).  In other words, a major purpose of

the Wilderness Act was to prevent precisely what happened in this case.  Through its

Roadless Rule adoption, the Forest Service set aside a large area of national forest land on

which use would be limited–even more limited in some respects than uses in wilderness areas.

The Forest Service and WOC argue that in spite of the provisions of the Wilderness Act, the Forest Service had that authority under its Organic Act and MUSYA to promulgate the Roadless Rule.  (Forest Service Brief at 27-34; WOC Brief at 48-53).  In so arguing, they assert the District Court erred in finding that the Wilderness Act impliedly repealed the Forest Service's authority under the Organic Act and MUSYA.  Neither of these arguments is correct.

First, none of the cases cited by the Forest Service and WOC address a situation where the Forest Service administratively set aside a large block of land for protections as restrictive or more restrictive than those applied to "wilderness areas"–as that term is defined by the Wilderness Act.  Second, the District Court did not find an implied repeal of the Forest Service's regulatory authority.  The District Court's holding simply recognizes, consistent with the act's history and plain language, that the Wilderness Act placed a limitation, not on every type of management for wilderness values, but on designating large tracts of land for protection consistent with that required for "wilderness areas."  *See also Bob Marshall Alliance v. Hodel,* 852 F.2d 1223, 1229 (9th Cir. 1988) (" '[w]ithdrawal' of public lands requires a formal procedure which, for parcels exceeding 5000 acres, includes congressional approval").  Certainly, the Forest Service retains the discretion to manage areas of national forests for wilderness values pursuant to the NFMA planning process.  What it cannot do is lock up vast tracks of land over the entire country for "long-term protection" outside the

48

forest planning process. (Aplt.App. at 1524). Such action is clearly tantamount to a wilderness designation, which the Forest Service concedes is a power reserved to Congress. (Aplt.App. at 1238).

Second, the Organic Act does not permit the Forest Service to promulgate regulations that clearly violate other statutes. The Organic Act provides that national forests are established to "improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber[.]" 16 U.S.C. § 475. It authorizes the Forest Service to "regulate their occupancy and use[.]" 16 U.S.C. § 551. Absolute power over federal lands resides in Congress, and the Forest Service's rulemaking must therefore conform to congressional mandates, including NFMA, MUSYA and the Wilderness Act. *See e.g. Amax Land Co. v. Quarterman,* 181 F.3d 1356, 1366-68 (D.C. Cir. 1999) (Interior Department's rulemaking under the Mineral Leasing Act must also conform to the Debt Collection Act). The Roadless Rule violates NFMA, MUSYA, and the Wilderness Act, and is therefore not a valid exercise of the Forest Service's rulemaking power under the Organic Act.

Moreover, rules of statutory construction also undercut the assertion that the Roadless Rule is a valid exercise of the Forest Service's rulemaking power under the Organic Act. Where two statutes can co-exist, a court should give effect to both. *Morton v. Mancari,* 417 U.S. 535, 551 (1974); *NISH v. Rumsfeld,* 348 F.3d 1263, 1272 (10th Cir. 2003). Different statutes enacted over time should be harmonized, *Utah v. Babbitt,* 53 F.3d 1145, 1149 (10th Cir. 1995), and a more general statute cannot be read to "eviscerate" requirements in a more

specific statute. *Sierra Club-Black Hills Group v. U.S. Forest Serv.,* 259 F.3d 1281, 1287 (10th Cir. 2001). This is especially true where the subsequent statute "more specifically address[es] the topic at hand." *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 143 (2000).

The Organic Act's general grant of authority cannot be read to eviscerate the more specific and later-enacted MUSYA, Wilderness Act, and NFMA provisions. Instead these grants of authority should be harmonized. Reading the four laws together, effect can be given to all of them. The Forest Service has authority to manage national forests for protection of their wilderness values as part of the forest planning process, but it does not have authority to set aside large areas of National Forest lands indefinitely and impose blanket restrictions on access to and use of those areas. It has an obligation to evaluate and plan forest use on a forest-by-forest basis using multiple use principles.

## III.   The District Court properly enjoined the Roadless Rule nationwide upon finding the rule was illegally promulgated.

Finally, the Forest Service and WOC contend the District Court erred when it set aside the Roadless Rule and ordered that it be permanently enjoined to remedy the Forest Service's violations of NEPA and the Wilderness Act. *Wyoming,* 570 F.Supp.2d at 1354-55. Of course, the District Court imposed the exact remedy that the APA requires. A court has a mandatory, non-discretionary duty to set aside agency action found to be "arbitrary capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A); *Forest Guardians v. Babbitt,* 174 F.3d 1178, 1188-89 (10th Cir. 1999). Accordingly, the court properly enjoined the Roadless Rule nationwide. *Nat'l Mining Ass'n*

*v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *Citizens for Better Forestry v. USDA*, 632 F.Supp.2d 968, 982 (N.D. Cal. 2009). The court also properly concluded that the harm from the Roadless Rule's promulgation in violation of NEPA was not limited to the harm Wyoming asserted for standing purposes, but rather was the harm to the environment that can be presumed from uninformed decision making. *See Davis,* 302 F.3d at 1114. The Roadless Rule is a rule of national scope and the court reasonably concluded a broad injunction was required to prevent harm on that same scale.

It is important to note, that the Ninth Circuit approved of exactly the same remedy in *California ex rel. Lockyer v. USDA*, 575 F.3d 999 (9th Cir. 2009). There the Court held that the California District Court did not abuse its discretion when it set aside and permanently enjoined the implementation of the State Petitions Rule nationwide. *Id.* at 1020. It is worth noting that many of the parties and amici curiae who have appeared in this action were also parties in *Lockyer*, but <u>none</u> of them asked the Ninth Circuit to limit the California District Court's permanent injunction of the State Petitions Rule to the boundaries of a particular state or region. Thus, the Ninth Circuit, the Appellants, and amici curiae all recognize that the appropriate remedy in these circumstances is to vacate the invalid rule and enjoin its implementation on a scale commensurate with its scope.

## <u>CONCLUSION</u>

For the foregoing reasons, Wyoming respectfully requests that the Judgment of the District Court be affirmed.

DATED this 22nd day of December, 2009.

Attorney for Appellee State of Wyoming

/s/ James Kaste

Jay Jerde
Deputy Attorney General
James Kaste
Senior Assistant Attorney General
123 State Capitol
Cheyenne, WY  82002
(307) 777-6946
(307) 777-3542   fax
jjerde@state.wy.us
jkaste@state.wy.us

## ORAL ARGUMENT IS REQUESTED

Appellants have requested oral argument. Wyoming agrees that the factual and legal issues presented in this appeal are both novel and complex, and that oral argument would benefit the Court.

## STATEMENT REGARDING THE APPLICATION OF RULE 31.3

The State of Wyoming is exempt from the joint briefing requirement of 10th Cir. R. 31.3, and therefore, files this brief independently of any other Appellees.

## CERTIFICATE OF COMPLIANCE WITH RULE 32 (a)(7)(B)

I hereby certify that this brief complies with the type-volume limitation contained in Rule 32 (a)(7)(B), Fed. R. App. P. This brief contains 13,974 words. The undersigned has relied upon the word count generated by the word-processing system used to prepare the brief to determine the number of words in the brief.

/s/ James Kaste_____
Wyoming Attorney General's Office

## CERTIFICATE OF DIGITAL SUBMISSIONS

The undersigned certifies that: (1) all required privacy redactions have been made and, with the exception of those redactions, every document submitted in digital form or scanned PDF format is an exact copy of the written document filed with the Clerk, and (2) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program (Symantec Antivirus, Version 10) and according to the program, are free of viruses.

/s/ James Kaste_____
Wyoming Attorney General's Office

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 22nd day of December, 2009 a true and correct copy of the foregoing was filed with Clerk of Court using the CM/ECF system which will send notification to the following e-mail addresses:

John Smeltzer
David C. Shilton
U.S. Department of Justice
P.O. Box 23795
Washington, DC 20026-3759
john.smeltzer@usdoj.gov
david.shilton@usdog.gov

James S. Angell
Earthjustice Legal Defense Fund
1400 Glenarm Place, Suite 300
Denver, CO 80202
Attorneys for Intervenor Defendants
jangell@earthjustice.org

Douglas L. Honnold
Timothy J. Preso
Earthjustice Legal Defense Fund
209 South Willson Avenue
Bozeman, MT 59715
Attorney for Intervenor Defendant
dhonnold@earthjustice.org
tpreso@earthjustice.org

Paul M. Seby
Marian C. Larsen
Moye White LLP
1400 16th Street, Sixth Floor
Denver, CO 80202
Paul.seby@moyewhite.com
Mimi.larsen@moyewhite.com

The undersigned further certifies that the following counsel of record for the Amici states were provided courtesy copies of the foregoing by e-mail delivered to the following addresses:

Sally Magnani
sally.magnani@doj.ca.gov
Attorney for the State of California

Jeremiah Weiner
jweiner2@mt.gov
Attorney for the State of Montana

Roger DeHoog
dehoog@doj.state.or.us
Attorney for the State of Oregon

Mary Sue Wilson
marysuew@atg.wa.gov
Attorney for the State of Washington

/s/ James Kaste_____
Wyoming Attorney General's Office